UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

MARIETTA VIERA, on behalf of herself
and all others similarly situated,

                 Plaintiff,

    v.

ANCIENT BRANDS, LLC, d/b/a ANCIENT
NUTRITION,

-----------------------------------------------------------------X

Case No.:

**COMPLAINT**

       Plaintiff Marietta Viera, on behalf of herself and all others similarly situated ("Plaintiff"),

by and through her undersigned counsel, Denlea & Carton LLP, states for her Complaint against

Ancient Brands, LLC, d/b/a Ancient Nutrition ("Ancient Nutrition" or "Defendant"), as follows:

<u>**PRELIMINARY STATEMENT**</u>



1.    This action seeks to redress the false, misleading, and deceptive advertising and

packaging claims that Ancient Nutrition has made in connection with the sale of its purportedly

scientifically studied and proven "brain-boosting" collagen protein powder sold under the brand

name "Multi-Collagen Protein, *Brain Boost*" (hereinafter "Brain Boost").

2.    The protein powder is sold in a cylindrical container, common to many other protein powders on the market, with the term *Brain Boost* prominently emblazoned in the center, with the words "clinically studied ingredients" appearing in the upper left hand corner in caps:



3.    Toward the bottom of the container, a graphic icon depicts a crudely drawn figure of a human head radiating rays of enlightenment, the classic and well-recognized "light bulb" motif, with the words "mental clarity" appearing directly below it.



4.     The label on the back of the container identifies the secret ingredient behind the promise of increased mental clarity and concentration as an herbal cocktail trademarked as "Multi Collagen Complex & Brain Boost Blend," as seen below:



5.     On Amazon.com, Ancient Nutrition's *Brain Boost* specifically boasts that *Brain Boost* confers "cognitive-boosting benefits" while directly targeting consumers struggling with a "busy schedule" or those that "need to focus," thereby sending a clear message that consuming the protein powder will somehow increase their day-to-day mental performance and acuity.



6.      On its own website, Ancient Nutrition falsely promotes *Brain Boost* as being a "one-of-a-kind supplement [that] offers body-wide support for mental clarity and concentration" and that it is infused with a "blend of botanicals and adaptogens that have been used for centuries to support cognitive health."[1]

7.      To deceive consumers that its exceedingly unremarkable protein powder is allegedly backed not only by the historical record, but also by the rigors of the scientific process, Ancient Nutrition falsely employs a series of words and phrases such as "clinically studied," "supported by proven research," "backed by peer-reviewed studies," and "tested for efficacy, safety and transparency," to convey the false and deceptive impression that *Brain Boost* itself has been scientifically proven to deliver the benefits it claims.

8.      Lest there be any doubt, Ancient Nutrition unambiguously proclaims that "when we make claims about our products, ***we really mean them***."[2]

# Clinically proven

Whenever possible, we believe in using ingredients backed by clinical studies. "Clinically studied" means our ingredient is a) supported by proven research, b) backed by peer-reviewed studies and c) tested for efficacy, safety and transparency. Using clinically studied ingredients means that when we make claims about our products, we really mean them.

---

[1].     https://ancientnutrition.com/blogs/all/collagen-brain-boost-supplement
[2].     https://ancientnutrition.com/products/multi-collagen-protein-powder-brain-boost?variant=39911312326726

9.    Initially, it is axiomatic that there is nothing preventing any supplement manufacturer from using only ingredients that are "backed by clinical studies." That Ancient Nutrition claims to only use them "whenever possible," as can be seen in the above screenshot, allows them to distract the consuming public from the realization that their claims are meaningless.

10.    Despite claiming that their otherwise unremarkable, vanilla flavored protein powder is made from "clinically studied" or "clinically proven" ingredients that promise increased "mental clarity and concentration," a "positive mindset," and "alleviate the effects of stress and tension," the claims are decidedly false, misleading, and amply contradicted by prior studies and research.



11.    Unfortunately for consumers, however, the falsity of these claims has not deterred Ancient Nutrition from deceptively marketing *Brain Boost* as a novel product created through clinical development and which is allegedly backed by clinical results to support its purported

efficacy. Indeed, in the FAQ section for *Brain Boost* contained on its website, under the tab "How long before I start noticing results?" Ancient Nutrition goes so far as to claim falsely that "clinical studies have demonstrated noticeable results in as little as 24 hours."[3]  Of course, no such studies are cited or identified.

12.     The reality is that *Brain Boost* is nothing more than another in a long line of useless "brain health" or "nootropic" supplements littering the market that deceptively attempt to leverage the authoritative weight of science to dupe health conscious and/or elderly consumers for whom the symptoms of cognitive decline are, understandably, of great concern.

13.     The market for brain health supplements has never been larger than it is today and, by 2023, is expected to reach $5.8 billion dollars in sales.[4] Other estimates predict that the market for brain supplements will grow even higher, to a whopping $11.6 billion dollars in sales by 2024.[5]

14.     To be sure, "more than a quarter of Americans ages 50 to 73 are regularly taking supplements for their brain health, and that this figure rises to 36 percent for those over 74."[6] Further, according to an AARP survey, "[t]hough more than 75 percent of those surveyed said they think supplements can help maintain and improve brain health, and though nearly half think they can help prevent and reverse dementia, there's no scientific evidence to support such beliefs[.]"[7]

15.     Not only is it the case that brain health supplements in general lack any efficacy, the entire industry is justifiably derided by prominent neurologists as a brand of "pseudomedicine"

---

[3].    https://ancientnutrition.com/products/multi-collagen-protein-powder-brain-boost?variant=39911312326726
[4].    https://www.aarp.org/health/drugs-supplements/info-2019/brain-supplements-survey.html
[5].    https://www.ucsf.edu/news/2019/01/413131/aging-americans-fall-prey-brain-boosting-supplements-offering-hope-hype-and
[6].    https://www.aarp.org/health/drugs-supplements/info-2019/brain-supplements-survey.html
[7].    *Id.*

that sustains itself by feeding upon growing anxieties about diseases such as dementia and Alzheimer's in an aging American populace.[8]

16.     For example, Gingko Biloba's alleged benefits for cognitive improvement, one of the herbs that Ancient Nutrition features in its "Brain Boost Blend," has long been debunked.[9] The National Institutes of Health did not mince words: "There's no conclusive evidence that ginkgo is helpful for any health condition."[10]

17.     Similarly, Bacopa Brahmi, an herb traditionally used in India and another constituent ingredient in "Brain Boost," was debunked decades ago as having "no significant effect … on measures of short-term memory, working memory, attention, or the retrieval of information from long-term memory[.]"[11]

18.     Lion's mane, an edible mushroom, and another ingredient in "Brain Boost", is more recently studied but, nevertheless, has no effect on cognitive function.[12]

19.     Ashwagandha, another herb supplement commonly used as a stress reliever, is conceded to be inefficacious even by its most ardent proponents.[13]

20.     To borrow from mathematics, if none of the individual ingredients in *Brain Boost* can improve a consumer's mental acuity, them consuming them in a single product will have no effect either. Simply put, four times zero is still zero.

---

[8].     https://www.ucsf.edu/news/2019/01/413131/aging-americans-fall-prey-brain-boosting-supplements-offering-hope-hype-and

[9].     https://www.nccih.nih.gov/health/ginkgo

[10].    *Id.*

[11].    https://www.nature.com/articles/1395862

[12].    https://www.alzdiscovery.org/cognitive-vitality/ratings/lions-mane#:~:text=However%2C%20there%20were%20no%20significant,or%20beneficial%20for%20dementia%20patients

[13].    https://www.mskcc.org/news/truth-about-ashwagandha

21.     Further compounding its deceptions, Ancient Nutrition does not even bother to disclose to consumers the concentrations or daily value of the purportedly "brain boosting," yet unquestionably useless, herbs that constitute its "Multi Collagen Complex & Brain Boost Blend."

22.      Compounding the reality that the herbal cocktail offered by Ancient Nutrition does not confer any benefits, <u>baking</u> or <u>cooking</u> with *Brain Boost*, a suggested mode of consumption obviously involving the use of high heat, does nothing other than destroy the purportedly nootropic ingredients otherwise consumed in capsule or tablet form.



23.     By deceptively misrepresenting the efficacy of *Brain Boost*, Ancient Nutrition has defrauded consumers into purchasing the supplement and has commanded and continues to command a price premium for each container sold.

24.     Based upon the unfair and deceptive "Clinically studied"  and "Clinically proven" claims, Plaintiff and consumers like her purchased *Brain Boost* because they believed that it was clinically proven to help them improve cognitive function. Plaintiff and other consumers purchased *Brain Boost* with a reasonable expectation as to its premium quality and, more importantly, clinical efficacy. Moreover, Plaintiff purchased *Brain Boost* notwithstanding the fact that similar nootropic supplements not marketed as "clinically studied" or "clinically proven" were available from other manufacturers for much less money.

25.     Accordingly, Plaintiff and her fellow class members have been injured because they purchased *Brain Boost* protein powder that they would not have otherwise purchased and/or paid a premium for a nootropic supplement that purported to be clinically studied and proven to improve cognitive function or focus but, in actuality, was not clinically proven. Plaintiff and members of the class were deceived by Defendant's deceptive marketing and Defendant profited from that deception at Plaintiff's and the class members' expense.

26.     By this action, Plaintiff seeks to redress Ancient Nutrition's unfair and deceptive marketing campaign built upon the misleading claims that it makes and to obtain the financial recompense to which Plaintiff and her fellow class members are entitled.

## THE PARTIES

27.     Plaintiff Marietta Viera is an individual who resides in Queens, New York.

28.     Defendant Ancient Brands, LLC, d/b/a Ancient Nutrition is a Florida limited liability company with its principal address at 405 Duke Dr, Suite 260, Franklin, Tennessee 33431.

29.     Ancient Nutrition manufactures, markets, and sells *Brain Boost* through online and brick-and-mortal retail stores such as Target, GNC, The Vitamin Shoppe, and Walmart.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because (1) the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, and (2) the named Plaintiff and Defendant are citizens of different states.  28 U.S.C. § 1332(d)(2)(A).

31.     The Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as the parties are diverse and the amount in controversy exceeds the requisite threshold.

32.     This Court may exercise jurisdiction over Defendant because Defendant has sufficient minimum contacts in New York and purposely avails itself of the markets within New York through the promotion, sale, marketing, and distribution of its products, thus rendering jurisdiction by this Court proper and necessary.

33.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred within this judicial district and because Defendant has marketed and sold the products at issue in this action within this judicial district and has done business within this judicial district.

## CHOICE OF LAW

34.     New York law governs the state law claims asserted herein by Plaintiff and the class members she seeks to represent.

35.     New York has a substantial interest in protecting the rights and interests of New York consumers against wrongdoing by companies that market and distribute their products within the State of New York.

## FACTUAL BACKGROUND

**I.     Manufacturers Routinely Misrepresent That Their Products Have Been Clinically Proven Because of the Price Premium Consumers are Willing to Pay for Products that are Backed by Science**

36.     Consumers who are seeking relief from cognitive problems and disorders are particularly vulnerable targets for unscrupulous manufacturers and advertisers.  In a bid to avoid the side effects and chemical dependencies that can arise when using prescription medications, consumers plagued with cognitive problems are willing to pay a premium for nootropic supplements that are studied clinically and clinically proven.  In an overcrowded marketplace

where beneficial health claims are ubiquitous, being able to demonstrate the efficacy of a product is critical.

37. Unsurprisingly, in order to differentiate their products and gain a competitive edge, manufacturers and advertisers routinely mislead consumers by claiming that the efficacy of their products is backed by science (*i.e.*, "establishment claims"), when, in fact, it is not. Equally unsurprising is the fact that Courts are wary of claims by manufacturers that their product has been studied clinically and clinically proven when, as here, those claims are false.

38. An advertiser's health-related claims about the efficacy of a product must "be supported with 'competent and reliable scientific evidence," which the Federal Trade Commission (the "FTC") defines as "'tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results.'"[14] As the FTC has stated, "well-controlled human clinical studies are the most reliable form of evidence."[15]

## II. Ancient Nutrition Markets Its *Brain Boost* Protein Powder as "Clinically Studied" and "Clinically Proven"

39. Ancient Nutrition was formed in 2016 by "Dr. Josh Axe" and infamous entrepreneur Jordan Rubin, who sold his previous venture, a supplement company named Garden of Life, in 2009. Rubin made millions of dollars from the sale and promptly began searching for his next cash cow.

---

[14]. FTC, Dietary Supplements: An Advertising Guide to Industry, Section II(B), at https://www.ftc.gov/tips-advice/business-center/guidance/dietary-supplements-advertising-guide-industry

[15]. FTC, Dietary Supplements: An Advertising Guide to Industry, Section II(B)(2), at https://www.ftc.gov/tips-advice/business-center/guidance/dietary-supplements-advertising-guide-industry

40.     Rubin is no stranger to presiding over shoddy supplement companies that routinely engage in deceptive advertising. In 2006, Rubin's prior supplement company, Garden of Life, settled with the FTC following complaints that it falsely marketed many of its supplements as being able to cure a variety of ailments in addition to making many false claims that its products were clinically proven or otherwise supported by clinical proof.[16]

41.     "Dr. Axe," for his part, is the quintessential portrait of a carnival barker offering to sell passersby the secret elixir of immortality if only they would follow him to his tent where, upon entry, he proceeds to excitedly, but much to the confusion of his unwary mark, wave a bundle of dirty carrots:



42.     To be sure, "Dr. Axe" holds himself out to the public as "a doctor of chiropractic, certified doctor of natural medicine and clinical nutritionist with a passion to help people eat healthy and live a healthy lifestyle."[17] All of which, of course, is a drawn out way of stating the obvious truth that the self-renowned "Dr. Axe," a contemporary renaissance man, is not a medical

---

[16].     https://www.ftc.gov/news-events/news/press-releases/2006/03/dietary-supplement-maker-garden-life-settles-ftc-charges

[17].     https://draxe.com/about-dr-josh-axe/

doctor at all, and is not licensed, by any state in the country, to diagnose or treat any disease or condition.

43.     Indeed, the "Dr. Axe" persona is nothing more than a marketing gimmick used to sell unwary consumers a variety of worthless supplements under the guise of being a "natural medicine" whose long forgotten curative properties are just now being rediscovered.

44.     Naturally, the coveted secrets hidden deep within the confines of regular, everyday food products cannot be fully restored to their proper place within the pantheon of the healing arts without "Dr. Axe's" accompanying oeuvre of absurd pseudoscientific literature bearing such catchy titles as "Eat Dirt: Why Leaky Gut May Be the Root Cause of Your Health Problems and 5 Surprising Steps to Cure It" and "Ancient Remedies: Secrets to Healing with Herbs, Essential Oils, CBD, and the Most Powerful Natural Medicine in History," among other provocative titles.[18]

45.     To nobody's surprise, "Dr. Axe has been a regular guest expert on *The Dr. Oz Show*, covering such topics as the gut microbiome, weight loss, digestive health (such as leaky gut and candida) and herbal medicine" and has made his mark by hosting "corporate wellness programs for companies such as Nissan, Whole Foods, Mercy Ministries, Lifeway" and being featured "as a keynote speaker at conferences all over the country, including South by Southwest (SXSW), PaleoFX and the Autism Education Summit."[19]

46.     In short, "Dr. Axe" is a charismatic "front-man" who has teamed up with an unscrupulous marketing specialist to "restore health, strength and vitality by providing history's healthiest whole food nutrients to the modern world"[20] while masterfully separating consumers from their hard earned dollars.

---

[18] .     *Id.*
[19] .     *Id.*
[20] .     *Id.*

47.    At present, the Ancient Nutrition confidence operation is a thriving supplement business operating out of Tennessee, with several prominent investors.[21] Selling over 80 different products, many of which are collagen based and promise a variety of dubious benefits, the company is in an upward trajectory following an initial infusion of more than $100 million dollars in investment.[22]

48.    Currently, Ancient Nutrition is embroiled in active federal litigation stemming from its deceptive advertising of the protein quantities in its collagen infused "bone broth" products, which are alleged to be present in far smaller concentrations than advertised, and being largely indigestible, thus misleading consumers for whom protein consumption is an essential dietary component.[23]

49.    Ancient Nutrition is also currently involved in a pending federal litigation in Illinois commenced by a competitor alleging that Ancient Nutrition is misleading consumers by advertising that its collagen peptide supplements offer "head-to-toe" results (i.e. improved joint function, immune support, improved hair and nails, etc.), in as little as one day of use.[24] Given the absurdity of touting virtually instant results, the Northern District of Illinois rejected Ancient Nutrition's attempt to have the lawsuit dismissed.[25]

50.    With the onset of the COVID-19 pandemic and intensified concerns about health in the general population, Ancient Nutrition has also tried its hand in taking advantage of

---

[21].    https://www.bizjournals.com/nashville/news/2018/03/08/franklin-company-lands-103m-investment-with-the.html
[22].    *Id.*
[23].    https://www.classaction.org/news/class-action-alleges-ancient-nutrition-bone-broth-protein-powder-labels-mislead-consumers-as-to-protein-content-quality
[24].    https://casetext.com/case/vital-proteins-llc-v-ancient-brands-llc
[25].    *Id.*

consumers flocking to the "immunity" market with various Vitamin C and Zinc based supplements targeting those desperate to strengthen their immune systems.[26]

51.     Not surprisingly, Rubin and "Dr. Axe" have turned their attention to "nootropics," or brain health supplements, and ramped up their deceptive marketing techniques to transform an otherwise unremarkable collagen protein powder into a "brain boosting" supplement that promises to enhance cognitive function and mental acuity.

52.     By labelling every container of *Brain Boost* protein powder as containing "clinically studied ingredients," which Ancient Nutrition openly explains on its own website is a synonym for "clinically proven," Ancient Nutrition clearly and conspicuously markets *Brain Boost* as a product whose efficacy has been rigorously tested and scientifically confirmed, when neither of those assertions is truthful.

## III.  The "Clinically Studied" and "Clinically Proven" Claim is False and Misleads Consumers

53.     Reasonable consumers understand that the "Clinically studied" and "Clinically proven" claims convey that the dietary supplement sold under the name *Brain Boost* has been scientifically proven to improve cognitive functions, focus, and concentration. Indeed, these promises are prominently displayed on the product label, as well as other marketing materials disseminated through Ancient Nutrition's website.

54.     The "Clinically studied" and "Clinically proven" claims, however, are patently false since *Brain Boost* has never once been tested in a clinical setting. Moreover, the constituent ingredients in the "Brain Boost Blend" confer no benefits at all.

---

[26].     https://www.newhope.com/vitamins-and-supplements/ancient-nutrition-accelerates-launch-immunity-line

55.    Ancient Nutrition's advertising is very clearly designed to manipulate consumers with an appeal to scientific authority while, at the same time, concealing the fact that the ingredients in the *Brain Boost* protein powder are inefficacious and do not improve cognitive function.

## IV.    **Plaintiff Purchased *Brain Boost***

56.    Plaintiff purchased *Brain Boost* in or around October 2022 at a local Target store in Queens, New York for $49.00. Plaintiff consumed *Brain Boost* for 6 months, with several repeat purchases at Walgreens and CVS, with no apparent benefit.

57.    Prior to purchasing *Brain Boost*, Plaintiff was exposed to its marketing on the internet and in-store advertisements. In addition, Plaintiff reviewed the product packaging, which stated that it was "clinically studied" and "clinically proven."

58.    Plaintiff purchased *Brain Boost* believing that, as a clinically proven product, it would improve her cognitive functions and increase focus, concentration, and mental clarity. However, Plaintiff soon discovered that *Brain Boost* had no effect.

59.    Had Plaintiff known that *Brain Boost* was not clinically proven to improve cognitive function, she would not have purchased it or, at the very least, would not have paid the premium charged.

60.     Countless and far cheaper alternatives are on the market but, unlike the dubious and opaque supplements sold by Ancient Nutrition, are not deceptively marketed as "clinically

studied" or "clinically proven." The ingredients themselves, worthless as they are, can be obtained

for as little as $12.99[27] vs. the *Brain Boost* price of $54.95.[28]

61.    Indeed, any consumer purchasing the nootropic supplements referenced above

would, unlike *Brain Boost*, also be provided with reliable metrics (i.e. milligrams per serving) that

they are consuming of each ingredient. The absence of such nutritional value on *Brain Boost* labels

raises additional, serious questions as to the integrity of the product.

## V.    CLASS DEFINITION AND ALLEGATIONS

62.    Plaintiff brings this action on behalf of herself and all other similarly situated

consumers in the State of New York pursuant to Rule 23 of the Federal Rules of Civil Procedure,

and seeks certification of the following class (the "Class"):

> All consumers who, within the applicable statute of limitations
> period, purchased in the State of New York (whether online or in-
> person) *Brain Boost* supplements – manufactured, marketed,
> distributed, and/or sold by Defendant (the "Class Product").
> Excluded from the class are Defendant, its parents, subsidiaries,
> affiliates, officers and directors, judicial officers and their
> immediate family members and associated court staff assigned to
> this case, and those who purchased the Class Product for resale.

63.    Plaintiff expressly disclaims any intent to seek any recovery in this action for

personal injuries that she or any Class member may have suffered.

64.    **Numerosity**. This action is appropriately suited for a class action. The members

of the Class are so numerous that joinder of all members of the Class is impracticable. Plaintiff is

informed, believes, and thereon alleges, that the proposed Class contains thousands of purchasers

---

27.    https://www.amazon.com/8630mg-Booster-Concentrated-Extract-
Ginkgo/dp/B0BG2M5QHK/ref=sr_1_5?crid=KDLXUCDHKNHH&keywords=GriMed+neuro+booster&qid=16674
16959&sprefix=grimed+neuro+booster%2Caps%2C59&sr=8-5
28.    https://ancientnutrition.com/products/multi-collagen-peptides-brain-boost-spring-23-catalog-capsules-90-
capsules?variant=40517984190534&gclid=CjwKCAjwzuqgBhAcEiwAdj5dRqVawIojdCiW1VPPg_0sf1dVTd0VB
dbp1XlQ-zPTrtIXByS3ss0m_hoCAm8QAvD_BwE

of the Class Product who have been damaged by Defendant's conduct as alleged herein.  The precise number of Class members is unknown to Plaintiff.

65.    **Existence and Predominance of Common Questions of Law and Fact**.  This action involves questions of law and fact common to the Class.  The common legal and factual questions include, but are not limited to, the following:

- Whether Defendant's conduct, as alleged herein, constitutes violations of New York General Business Law Section 349.

- Whether Defendant's conduct, as alleged herein, constitutes violations of New York General Business Law Section 350.

- Whether Defendant labeled, advertised, marketed, and/or sold the Class Product as "Clinically Studied" and "Clinically Proven"

- Whether Defendant's labeling, advertising, marketing, and/or selling of the Class Product as "Clinically Studied" and "Clinically Proven" was and/or is false, fraudulent, deceptive, and/or misleading.

66.    **Typicality**.  Plaintiff's claims are typical of the claims of the members of the Class, because, inter alia, all Class members have been injured through the uniform misconduct described above and were subject to Defendant's blatant misrepresentation that the Class Product was "Clinically Studied" and "Clinically Proven."

67.    Moreover, Plaintiff's claims are typical of the Class members' claims.  Plaintiff is advancing the same claims and legal theories on behalf of herself and all members of the Class.

68.    **Adequacy of Representation**.  Plaintiff will fairly and adequately protect the interests of the members of the Class.  Plaintiff purchased the Class Product, and she was harmed by Defendant's deceptive misrepresentations.  Plaintiff has therefore suffered an injury in fact as a result of Defendant's conduct, as did all Class members who purchased the Class Product. Plaintiff has retained counsel who are adept, sophisticated, and experienced in the field of class

action litigation, and have adequate resources to fully and zealously advocate on behalf of the class.

69.    **Superiority**.  A class action is superior to other methods for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant.  It would be virtually impossible for a member of the Class, on an individual basis, to obtain effective redress for the wrongs done to him or her.  Further, even if the Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no management difficulties under the circumstances here.

70.    Plaintiff seeks monetary damages, including statutory damages on behalf of the entire Class, and other equitable relief on grounds generally applicable to the entire Class. Unless a Class is certified, Defendant will be allowed to profit from its deceptive practices, while Plaintiff and the members of the Class will have suffered damages.

## COUNT I

### (Violation of New York General Business Law Section 349)

71.    Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 61 as if fully set forth herein.

72.    New York General Business Law § 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]."

73.     By labeling, advertising, marketing, distributing, and/or selling the Class Product to Plaintiff and the other Class members as "Clinically Studied" and "Clinically Proven" Defendant engaged in, and continues to engage in, deceptive acts and practices because the Class Product has not been studied clinically and clinically proven.

74.     In taking these actions, Defendant failed to disclose material information about its product, which omissions were misleading in a material respect to consumers and resulted in the purchase of the Class Product.

75.     Defendant has deceptively labeled, advertised, marketed, promoted, distributed, and sold the Class Product to consumers.

76.     Defendant's conduct was consumer oriented.

77.     Defendant engaged in the deceptive acts and/or practices while conducting business, trade, and/or commerce and/or furnishing a service in New York.

78.     Defendant's false "Clinically Studied" and "Clinically Proven" claims were and are misleading in a material respect as to whether the Class Product was, in fact, studied clinically and clinically proven.

79.     Based on, among other things, Defendant's knowledge that the Class Product was proven in a clinical setting, Defendant knew that by making the misrepresentations addressed herein, Plaintiff and other consumers would be misled into purchasing the Class Product and/or paying a premium price for the Class Product.

80.     Plaintiff and the Class members have been aggrieved by and have suffered losses as a result of Defendant's violations of Section 349 of the New York General Business Law. By virtue of the foregoing unfair, unconscionable, and deceptive acts in the conduct of trade or

commerce, Plaintiff and the members of the Class have been substantially injured by purchasing and/or overpaying for the Class Product which is not what Defendant represents it to be.

81.     By reason of the foregoing, Defendant's conduct, as alleged herein, constitutes deceptive acts and practices in violation of Section 349 of the New York General Business Law, and Defendant is liable to Plaintiff and the Class for the actual damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus statutory damages, treble damages, and attorneys' fees and costs.

82.     Defendant's conduct, as alleged herein, in violation of Section 349 of the New York General Business Law was engaged in by Defendant willfully and/or knowingly.  Accordingly, Plaintiff and members of the Class are entitled to an award of damages above and beyond their actual damages in accordance with Section 349(h) of the New York General Business Law.

### COUNT II
### (Violation of New York General Business Law Section 350)

83.     Plaintiff realleges and incorporates by reference the allegations in paragraphs 1 through 73 as if fully set forth herein.

84.     Defendant's labeling, marketing, and advertising of the Class Product is "misleading in a material respect," as it fails to disclose to consumers material information in Defendant's sole possession and, thus, is "false advertising."

85.     No rational individual would purchase the Class Product at the premium price at which it is sold if that individual knew that the Class Product was not clinically tested or clinically proven, which is how Defendant markets the Class Product.

86.     Defendant's advertisements and marketing of the Class Product as "Clinically Studied" and "Clinically Proven"  were consumer oriented.

87.    Defendant's advertisements and marketing of the Class Product as "Clinically Studied" and "Clinically Proven"  were misleading in a material respect.

88.    By virtue of the foregoing unfair, unconscionable, and deceptive acts in the conduct of trade or commerce in New York, Plaintiff and the members of the Class have been substantially injured by overpaying for a product that has diminished value due on account of the false claim that it has been studied clinically and clinically proven.

89.     Defendant's conduct, as alleged herein, constitutes false advertising in violation of Section 350 of the New York General Business Law, and Defendant is liable to Plaintiff and the members of the Class for the actual damages that they have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, statutory damages, plus treble damages, and attorneys' fees and costs.

90.    Defendant continues to violate Section 350 of the New York General Business Law and continues to aggrieve Plaintiff and the members of the Class.

**<u>PRAYER FOR RELIEF</u>**

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment against Defendant as follows:

A.    Certifying this action as a class action as soon as practicable, with the Class as defined above, designating Plaintiff as the named Class representative, and designating the undersigned as Class Counsel.

B.    On Plaintiff's Count I, awarding against Defendant the damages that Plaintiff and the other members of the Class have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus statutory damages and treble damages.

C.      On Plaintiff's Count II, awarding against Defendant the damages that Plaintiff and the other members of the Class have suffered as a result of Defendant's actions, the amount of such damages to be determined at trial, plus statutory and treble damages.

D.      On Plaintiff's Count I and II, awarding Plaintiff and the Class interest, costs, and attorneys' fees.

E.      Awarding Plaintiff and the Class such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: March 23, 2023
       White Plains, New York

                            **DENLEA & CARTON LLP**

                    By: _____
                            James R. Denlea
                            Jeffrey I. Carton
                            Stan Sharovskiy
                            2 Westchester Park Drive, Suite 410
                            White Plains, New York 10604
                            Tel.: (914) 331-0100
                            Fax: (914) 331-0105
                            jdenlea@denleacarton.com
                            jcarton@denleacarton.com
                            ssharovskiy@denleacarton.com